**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHRISTOPHER YOUNGER,      )
                                  )
           Plaintiff,      )     Case No. 20-878
                                  )
      v.                 )
                                  )     Magistrate Judge Patricia L. Dodge
R. GROSS, D. EDWARDS, A. TUCKER,  )
and J. HOLT,               )
                                  )
          Defendants.    )

## <u>MEMORANDUM OPINION</u>[1]

### I.    Relevant Background and Procedural History

Plaintiff, Christopher Younger, is proceeding *pro se* and was granted leave to proceed *in forma pauperis*.  (ECF No. 3.)  He commenced this civil rights action when he was a pretrial detainee at Allegheny County Jail.  (ECF No. 124 ¶ 1.)  As of at least October 27, 2021, Younger is no longer incarcerated.  (*See* ECF No. 101.)

The Second Amended Complaint, which is the operative pleading, names Allegheny County Jail Officer Holt, Captain Edwards, Sergeant Tucker, and Officer Gross as Defendants in their individual capacities.  (ECF No. 104.)  The Second Amended Complaint also named these Defendants in their official capacities as well as Warden Orlando Harper; however, the Court dismissed those claims with prejudice.  (*See* ECF Nos. 30, 105, 115, & 116.)  The claims at issue arise under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments of the United States Constitution.  (*Id.*)

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Therefore, the undersigned has the authority to decide dispositive motions and enter final judgment.

Pending now before the Court is Defendants' Motion for Summary Judgment, which argues that (1) Defendants did not violate the Eighth Amendment[2] prohibition on excessive force, (2) the Court should defer to the correction officials when dealing with issues concerning prison administration, (3) the Defendants are entitled to qualified immunity on the excessive force claims, and (4) Younger has failed to identify essential elements—a constitutionally protective activity and a causal connection—of his retaliation claim.  (ECF Nos. 123 & 125.)[3]

Although Younger filed a brief in opposition and supporting exhibits, he failed to properly respond to Defendants' Concise Statement of Material Facts (ECF No. 124) as required by Local Rule 56.C.1 because he failed to file any document that responds to each of the Defendants' numbered paragraphs.  "This rule requires non-moving parties to a motion for summary judgment to file a responsive concise statement in which they must: respond to each numbered paragraph in the movant's concise statement; admit or deny the facts contained in the movant's concise statement; set forth the basis for denial if any fact within the movant's concise statement is not entirely admitted by the non-moving party, with appropriate citation to the record; and set forth, in separately numbered paragraphs, any other material facts at issue."  *Peay v. Co Sager*, No. 1:16-cv-130, 2022 WL 565391, at *1 (W.D. Pa. Feb. 1, 2022), *report and recommendation affirmed by*,

---

[2]As discussed further below, Defendants erroneously apply the Eighth Amendment standard instead of the Fourteenth Amendment standard to this case.

[3] Although Defendants' Concise Statement of Material Facts contains a statement that "Plaintiff files complaints at the jail related only to the conduct of Officer Gross" (ECF No. 124 ¶ 14 (citing ECF No. 124-3)), this fact is not addressed in their Motion. Defendants do not move for summary judgment on the grounds of failure to exhaust administrative remedies under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996), nor could they, because the record reflects that Younger had been released by the time his Second Amended Complaint was filed (*see* ECF Nos. 101 & 104).  *See Garrett v. Wexford Health*, 938 F.3d 69, 98 (3d Cir. 2019) (holding that an amended complaint filed post-incarceration cures a former inmate's failure to exhaust administrative remedies while imprisoned so long as the amended complaint relates back to the initial complaint).

2022 WL 562936 (W.D. Pa. Feb. 23, 2022) (citing LCvR 56.C.1).  "Courts located in the Western District of Pennsylvania require strict compliance with the provisions of Local Rule 56."  *Id.* (collecting cases).

The "severe consequences for not properly responding to a moving party's concise statement" are that "[a]ny alleged material facts 'set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.'"  *Hughes v. Allegheny Cnty. Airport Auth.*, No. 1:15-cv-221, 2017 WL 2880875, at *1 (W.D. Pa. July 6, 2017) (citing LCvR 56.E), *aff'd*, 728 Fed. Appx. 140 (3d Cir. 2018).

Although courts provide some leniency to *pro se* litigants when applying procedural rules, *pro se* litigants may not ignore such rules.  *See Peay*, 2022 WL 565391, at *2 (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013) and *McNeil v. United States*, 508 U.S. 106, 113 (1993)).  Thus, the Court will treat Defendants' concise statement of material facts as undisputed but will consider any contradictory facts asserted by Younger insofar as they are supported in the record.[4]  *Whetstone v. Fraley & Schilling Trucking Co.*, No. 22-1018, 2022 WL 4533847, at *2 (3d Cir. Sep. 28, 2022).

Finally, the parties' submissions include two video recording of the June 14, 2019 incident. (Defendants' exhibit H-1 and H-2; Plaintiff's Exhibit 7).  Where the events at issue have been captured on videotape, the court must view the facts in the light depicted by the videotape in

---

[4] Younger's Second Amended Complaint is certified under the penalty of perjury and may be treated as an affidavit for the purpose of opposing Defendants' Motion.  *Reese v. Sparks*, 760 F.2d 64, 67 n.3 (3d Cir. 1985).

determining whether there is any genuine dispute as to material facts.  *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

## II.    Factual Background

Based on a review of the parties' briefing, the record, and the videos, many of the material facts in Defendants' concise statement are disputed.

It is undisputed that Younger's claims against Gross, Holt, Edwards, and Tucker relate to an incident that occurred on June 14, 2019 at the Allegheny County Jail, where Younger was a pretrial detainee. (ECF No. 124 ¶ 1; ECF No. 104 ¶¶ 10–24.)

According to Younger, Gross entered Younger's cell on June 14, 2019 and punched him in the face five times because he was upset that Younger had asked for a captain and a grievance after Gross would not let him go to the law library.  (ECF No. 104 ¶¶ 10–11.)  Younger then exited his cell with his belongings, because Defendant Gross told him "N***** you trying to tell on me" and told him "your (sic) going to the hole." (*Id.* ¶ 13.)  Thereafter, Gross "jumped on [Younger's] back to take [him] down" even though Younger was posing "'no' threat" to the correctional officers at the scene.  (*Id.* ¶ 14.)  Then, seven to ten other correctional officers ran and tackled Younger who was "never resisting."  (*Id.* ¶ 15.)  Holt "jumped on [Younger's] head," causing him to "badly chip" his front teeth.  (*Id.* ¶ 16.)  According to Younger, Tucker, another correctional officer, tased Younger many times on his side, back, and shoulder and stated, "Lets (sic) f*** him up," even though Younger "never resisted" and "was never the aggressor in this situation."  (ECF No. 104 ¶¶ 17–18, 31; ECF No. 133 at 4.)  Edwards then ordered that Younger be placed in a restraint chair, where he remained for eight or nine hours without food, medical treatment or bathroom breaks (forcing him to urinate on himself twice), contrary to an alleged policy that

required him to be monitored every hour and given an opportunity to move his limbs every two hours.[5]  (ECF No. 104 ¶¶ 19–21; ECF No. 133-1 at 23.)

In contrast, according to Defendants, Younger requested to go the library and "when he was denied that privilege, [he] refused orders to return to his cell or be handcuffed."  (ECF No. 124 ¶ 4.)  Defendant Gross entered Younger's cell at which point Younger "had already begun his non-compliance to Gross's orders."  (ECF No. 124 ¶¶ 17–18 (citing video exhibit H-1); *id.* ("Review of the video show that Plaintiff's resistance throughout the course of the event that is the subject of Plaintiff's complaint.").)  Defendants argue that their actions (handcuffing, tasing, and putting Younger in a restraint chair) were necessary to reestablish order because Younger was defying orders.  (*See generally*, ECF No. 125;  *see* ECF No. 124 ¶ 7 ("When Officer Holt and the other officers arrived on the scene, Plaintiff had already left his cell in defiance of Officer Gross' orders and Officers were unable to get handcuffs on the Plaintiff.");  *see also*, ECF No. 124-4 (Gross reporting that "Younger said 'fuck it im (sic) refusing to go in' and preceeded (sic) to walk around the bubble… I told Younger to cuff up and have a seat… Younger refused and said 'you arent (sic) cuffing me up'… [w]hen I attempted to handcuff Younger he aggressively kicked back and was squared up with me… [f]or officer safety as well as the inmates we took control… and secured him on the dayroom floor…"); ECF No. 124 ¶ 9 ("Tucker arrives on scene later and viewing Plaintiff still non-compliant, tases Plaintiff to get control of him.");  *see generally*, ECF No. 124-2 at 4 (Tucker reporting that "I observed officers on the floor… attempting to secure a combative inmate in cuffs. I immediately pulled my … taser and placed it on Inmate Youngers (sic) back and administered a 5 second drive-stun…").

---

[5] Neither party submitted proof on such policy.

Defendants offer no facts to dispute Defendant Edwards' involvement.  Rather they simply acknowledge that Younger "*alleges* that at a later time, Defendant Edwards order[ed] that Plaintiff be placed in a restraint chair, where he remained for nine hours without bathroom breaks, food, or medical treatment."  (ECF No. 124 ¶ 10 (citing ECF No. 104 ¶¶ 19–20) (emphasis added).)  This contradicts Tucker's Use of Force Occurrence report, which states that she ordered the restraint chair and order Younger's placement in the chair.  (*See* ECF No. 124-2 at 4 ("I [Tucker] called for a restraint chair from Intake."); *but see id.* at 2 (Defendant Edwards' report noting that "a restraint chair was ordered" without specifying by whom.).)

Younger was later seen by a dentist for a fractured tooth (ECF No. 124 ¶ 13 (citing ECF No. 124-6; *see also*, ECF No. 133-1 at 47, 55) and complains of bruising and PTSD problems (ECF No. 124 ¶ 16; *see also*, ECF No. 133-1 at 44 (medical note that Younger "reported to have been assaulted by a CO on 6/14/19 on 6F and still suffers pain from the injury.  Individual reported in gums/mouth and shoulder."); *id.* ("inmate reports depression, helplessness, mood swings, flashbacks, worry about several sick elderly relatives.  He has been [diagnosed] with PTSD…").

There are two videos of incident, neither of which contain sound.  The first video is from

a hallway camera and depicts the following relevant events:

| | |
|---|---|
| 10:40:01 | Two correctional officers are in the hallway walking towards the door to the common room – Correctional Officer #1 (presumably, Defendant Gross based on a review of the record) is located at the door leading to the common room and Correctional Officer #2 is coming from the hallway to the common room door.  Because the camera looks down the hallway and the door to Cell 123 is open perpendicular to the hallway, there is no view directly into Cell 123.  The camera's view down the hallway is obstructed by the door to Cell 123 except through a small portion of the cell door window through which a figure can be seen. |
| 10:40:06 | Both correctional officers are at the door to the common room and turn around to face the door to Cell 123.  They then turn and proceed through the doors and into the common room. |
| 10:40:14 | An inmate (presumably, Plaintiff Younger based on a review of the record) exits Cell 123 and walks down the hallway.  As he is walking, he talks to Gross and then continues down the hall off view of the camera. |
| 10:40:34 | Younger reappears on camera walking back down the hallway to Cell 123 and reenters Cell 123. |
| 10:41:00 | Gross crosses the common room from the back heading towards the hallway, goes through the common room door leading to the hallway, and walks to Cell 123. |
| 10:41:11 | Gross reaches the door of Cell 123 and opens it slightly more, however Younger is not visible.  A discussion appears to ensue.  Gross appears to take out a shiny metal object (presumably, handcuffs based on a review of the record). |
| 10:41:18 | Correctional Officer #2 arrives from the common room to the door frame that lead to the hallway.  Gross continues speaking and points to Correctional Officer #2 in the door frame leading to the common room. |
| 10:41:28 | Correctional Officer #2 begins to walk away from the hallway and back into the common room.  Gross, with his hand on the cell door, continues discussion. |

| 10:41:32 | Gross, leaving the door to Cell 123 open, looks around outside of the cell and into the common room.  He then turns around and goes back towards the door of Cell 123.  The camera's view of Gross is partially obstructed as he steps behind the open cell door. |
|---|---|
| 10:41:37 | Gross, again, leaves the cell door and walks towards and into the common room. |
| 10:41:46 | Gross turns around and walks back to Cell 123 with Correctional Officer #2 trailing behind. |
| 10:41:55 | Gross arrives at the door of Cell 123.  Correctional Officer #2 is at the door between the common room and the hallway.  Gross continues discussions with the occupant of Cell 123. |
| 10:41:57 | Gross pushes the cell door open slightly more. |
| 10:42:00 | Correctional Officer #2 has arrived near the door of Cell 123 and stands within a couple feet of the door.  Gross continues discussion with the occupant of Cell 123. |
| 10:42:11 | Gross moves towards the inside of Cell 123 with something in his hands.  Through the cell door window, Gross appears to be reaching towards the occupant of Cell 123.  Correctional Officer #2 is still standing nearby. |
| 10:42:14 | Correctional Officers #3 and #4 (presumably, Vause and Holt[6]) come running through the common room and through the door to the hallway. Correctional Officer #2 walks slowly closer to the door of Cell 123. |
| 10:42:19 | Gross is not visible, and Vause, Holt, and Correctional Officer #2, are grouped in front of the door of Cell 123. |
| 10:42:23 | Gross, Vause, and Holt are all entering (or attempting to enter) Cell 123, with Correctional Officer #2 staying back and observing. |
| 10:42:25 | Gross, Vause, and Holt exit the cell with Younger, who is carrying a bag of items.   They are moving Younger down the hallway and |

---

[6] It is unclear which correctional officer is Vause or Holt based on exhibits and the videos.  (*See* ECF No. 124-2 at 2 ("I reviewed the incident [via video]. At 10:41:10 Officer Gross was outside of Inmate Younger's cell.  At 10:42:14 Officer Gross attempts to cuff Inmate Younger and enters cell 123 followed by Officer Vause.  At 10:42:26 Inmate Younger is brought out of cell 123 by Officers Gross, Vause and Holt.").); *see also* ECF No. 124-5 at 2 (Holt Incident Report stating that he arrived at the scene and "saw Officers Gross and Vause attempting to handcuff" Younger.).

towards the door to the common room.  Gross appears to be trying to grab Younger's arms, and either Vause or Holt is assisting with his arms.  The other of Vause or Holt along with Correctional Officer #2 are following.

10:42:29        Gross and either Vause or Holt are holding on to Younger's arms and move him through the door to the common room.  The other of Vause or Holt is talking into a walkie talkie, and Correctional Officer #2 is following.

10:42:31        All individuals have made it through the door to the common room.  Looking through the doorframe, Gross and either Vause or Holt, with Younger in hand, all lean to the left.  They appear to fall on the ground together, with the other of Vause or Holt[7] jumping down to join the group.

10:42:35        Correctional Officer #2 joins the group on the ground and appears to assist.

10:42:37        Through the window to the common room, it appears that all four correctional officers are on top of and surrounding Younger.  The video camera angle makes discerning who is causing whom to move difficult, because the pile of individuals is obstructed by the bottom half of the wall into the common room.  The camera only looks through the door frame and the windows into the common room.

10:42:48        Suddenly, about a dozen correctional officers come running into the common room from the back door and surround the five individuals (Younger, Gross, Vause, Holt, and Correctional Officer #2) who are on the floor.  Some appear to assist on the floor, whereas others stand around the group observing.

10:43:30        For the remainder of the video, some correctional officers are on the floor, while about six or more are observing the group on the floor, and several others leave the common room.

---

[7] Given that Younger's sole allegation against Defendant Holt is that he jumped on Younger's head.  It would make sense that Holt is the person jumping down to join the group, however based on the video, one cannot tell for certain whether this individual is Vause or Holt.

9

The second video is from a camera in the adjoining common room and depicts the following relevant events:

| | |
|---|---|
| 10:42:00 | Through the windows of the common room, the lower half of bodies of Gross discussing with Younger in Cell 123 are visible. Correctional Officer #2, standing several feet away, from the Cell 123 is also partially visible.  The bag of items appears to be by Younger's feet. |
| 10:42:12 | Vause and Holt enter the frame, walking from the back of the common room towards the common room door that leads into the hallway with the cells.  Observing through the common room windows into the hallway, it appears that Gross is attempting to grab Younger's hands and place handcuffs on them. |
| 10:42:14 | Vause and Holt begin running through the common room towards the common room door that leads into the hallway to the cells. |
| 10:42:17 | Gross enters Cell 123 as Vause and Holt approach the door to Cell 123. |
| 10:42:22 | Gross, Vause, and Holt appear to have entered Cell 123; however, Correctional Officer #2 is partially obstructing the view of the entrance to the cell. |
| 10:42:25 | Gross, Vause and Holt exit the cell with Younger (and his bag of items) and move down the hallway and towards the door leading into the common room. Correctional Officer #2 follows. |
| 10:42:27 | Younger appears to be briefly pressed up against the glass of the windows into the common room. |
| 10:42:29 | Younger, with his bag, comes through the door to the common room with Gross "bear hugging" his arms.  Vause, Holt, and Correctional Officer #2 are following. |
| 10:42:31 | Gross leans his body towards his left side, swinging Younger, whose arms are being held by Gross, with him. |
| 10:42:31 | Vause and Holt join Gross in pulling Younger down. The four individuals all fall to the floor. |
| 10:42:37 | Correctional Officer #2 runs around the group and kneels on the ground to join. |

10

10:42:39          For about 10 seconds, all correctional officers are leaning over top of Younger, who is moving, and they grabbing at his arms and legs. Younger's face is pinned to the floor by a correctional officer's arm/elbow.

10:42:51          11 other correctional officers enter the frame, running and encircling the group on the floor. Seven remaining standing, whereas five joining the group on the floor. Younger is not visible as every space surrounding him contains a correctional officer.

10:42:56          A correctional officer (presumably, Defendant Tucker based on a review of the record) is standing in the circle with her back towards the door to the hallway and has a small black rectangular item in her hand (presumably, the Taser based on a review of the record). She appears to be taking something off the Taser.

10:42:57          Tucker reaches down with the Taser into the circle of correctional officers who are holding Younger down. She appears to make contact between the Taser and Younger's back. During this time, there appears to be generalized moving of Younger and/or the correctional officers and the side of Younger's face is being pressed down on the floor with a hand. Seven correctional officers are observing.

10:43:13          Tucker retracts her arm with the Taser from the circle. Approximately 15 seconds have elapsed since Tucker first made contact between the Taser and Younger's back.

10:43:20          Four of the correctional officers on the floor get up and there appear to be just three correctional officers left on the floor with Younger who appears to have both arms behind his back in a position suggesting handcuffs. The rest of the nine correctional officers are observing.

10:43:39          Only two correctional officers appear to be on the floor immobilizing Younger, the rest are standing up and looking around or down on the floor.

10:44:17          All but eight correctional officers leave the frame. As before, only two correctional officers appear to be on the floor holding Younger, the rest are standing up and looking around or down at the floor.

10:44:23          Younger moves and Tucker leans down with the Taser. Two other correctional officers approach to hold Younger.

| 10:44:25 | Tucker makes contact with the Taser and the back of Younger's right thigh. Younger does not appear to be moving and is being held down by four correctional officers. |
| 10:44:42 | Younger's head moves, and a correctional officer places his hand on the side of Younger's head and presses against the floor. |
| 10:44:54 | Three correctional officers (plus an additional one who entered the frame at 10:44:39) stand around the group watching. Four correctional officers pin Younger down while Tucker maintains contact between the Taser and the back of Younger's right thigh. |
| 10:45:59 | Tucker retracts the Taser from the back of Younger's right thigh and a yellowish glow appears. Approximately 1 minute and 35 seconds have elapsed since Tucker first made contact between the Taser and the back of Younger's right thigh. |
| 10:46:00 | Tucker appears to be placing the Taser on Younger's back between his shoulder blades. At this point, only three correctional officers are pinning him down and six are overlooking the scene. |
| 10:46:07 | Another correctional officer joins to pin down Younger; however, there was no discernable movement from Younger. Three correctional officers are milling around, and two correctional officers are overlooking the scene. |
| 10:46:47 | A correctional officer enters the frame wheeling the restraint chair. |
| 10:46:52 | Tucker retracts the Taser from Younger. Approximately 52 seconds have elapsed since Tucker first made contact between the Taser and Younger's back between his shoulder blades. |
| 10:47:02 | Tucker hands the four remaining correctional officers on the floor what appears to be a long leash-like item (presumably, a tether[8] based on a review of the record), which they connect to Younger's handcuffs. |
| 10:47:13 | A correctional officer is placing shackles on Younger's ankles. |
| 10:47:27 | Younger is assisted up by the four correctional officers who help pull him up and tether is held by Tucker. |

---

[8] *See* ECF No. 124-2 at 4 ("I ordered the officers to secure the tether to the cuffs and to apply shackles to [Younger's] ankles.").

| | |
|---|---|
| 10:47:29 | When he is fully standing, Younger says something to a correctional officer who is standing in front of him. He continues to speak as he is walking backwards towards the restraint chair with the other correction officers. |
| 10:47:36 | Younger is seated, without struggle, in the restraint chair. He continues to talk to the same correctional officer as four other correctional officers are arranging his straps in the restraint chair. |
| 10:47:48 | While the four correctional officers are arranging the straps in the restraint chair, Tucker goes around Younger and places the Taser on the front of his left thigh. |
| 10:47:51 | A correctional officer places a white large sock-like item over Younger's face (presumably, the spit mask[9] from a review of the record). Younger begins rocking his head back and forth. Tucker is still holding the Taser on Younger's left thigh. |
| 10:48:06 | Younger's head (either through the correctional officer's hands or by the correctional officer pulling on the spit mask) is being held back against the restraint chair. Four other correctional officers appear to be working on the restraints. |
| 10:48:29 | Tucker retracts the Taser from Younger's left thigh. Approximately 41 seconds have elapsed since Tucker first made contact between the Taser and Younger's left thigh. |
| 10:48:43 | Four to five correctional officers appear to continue working on the restraint as Tucker walks around and is behind Younger. Five other correctional officers are overlooking the scene. |
| 10:48:58 | Tucker appears to take her Taser out of its holster, while four correctional officers are holding Younger in the restraint chair. |
| 10:49:01 | Tucker appears to place the Taser on the middle of Younger's back. |
| 10:49:06 | Younger leans forward in the restraint chair, although it is unclear if this is his own volition or due to three or four correctional officers pressing him down. |

---

[9] *See* ECF No. 124-2 at 4 ("I ordered the officers to stand him up, walk him backwards and place him in the restraint chair and to apply [] a spit mask.")

| | |
|---|---|
| 10:50:08 | Tucker removes the Taser from Younger's back. Approximately 1 minute and 7 seconds have elapsed since Tucker first made contact between the Taser and Younger's back. |
| 10:50:22 | Tucker moves around to the front of Younger and reaches over his head to place the Taser on Younger's upper back. Four to five other correctional officers appear to be holding him in place. |
| 10:50:33 | Tucker removes the Taser from Younger's upper back. Approximately 11 seconds have elapsed since Tucker first made contact between the Taser and Younger's upper back. |
| 10:50:48 | The four or five correctional officers have continued to keep Younger in place leaning forward in the chair. |
| 10:51:17 | The spit mask appears to have slid off of Younger's face, and he looks up and is talking, while four to five correctional officers continue to adjust the restraint chair. |
| 10:25:26 | A correctional officer pulls the spit mask back up over Younger's face as three other correctional officers continue to adjust the restraint chair. |
| 10:51:55 | All correctional officers step back away from the restraint chair. Younger's mouth is still covered. |
| 10:52:06 | A correctional officer tilts the restraint chair back and begins moving Younger away. |
| 10:52:15 | A correctional officer takes a picture of Younger in the restraint chair. |

Throughout both videos it is difficult to determine (due to the fact that a complete view of Younger is frequently obstructed by other correctional officers surrounding him or physical obstacles such as a wall or cell door) why Younger is moving—through his own movements, those of multiple correctional officers engaged in the encounter, or a combination of both.

14

### III.    Legal Standard

As the Federal Rules of Civil Procedure provide, summary judgment must be granted if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Id.* (internal citation omitted).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented."  *Nat'l State Bank v. Fed. Rsrv. Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992) (internal citation and quotation omitted).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor.  *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

Although courts must hold *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary

15

judgment stage a *pro se* plaintiff is not exempt from his burden of providing some affirmative evidence, not just mere allegations, to show that there is a genuine dispute for trial. *See, e.g.*, *Barnett v. NJ Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014) (holding that *pro se* plaintiff was still "required to designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories . . . sufficient to convince a reasonable fact finder to find all the elements of her prima facie case") (citation and quotation omitted); *Siluk v. Beard*, 395 F. App'x 817, 820 (3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law"). However, courts should "consider as affidavits [Plaintiff's] sworn verified complaints, to the extent that they are based upon personal knowledge and set out facts that would be admissible in evidence." *Porter v. Pennsylvania Dep't of Corrs.*, 974 F.3d 431, 443 (3d Cir. 2020) (citations omitted).

Finally, because a "district court must construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion," "[i]n qualified-immunity cases, that 'usually means adopting . . . the plaintiff's version of the facts,' … unless 'no reasonable jury could believe it.'" *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 192 (3d Cir. 2021) (citing *Scott*, 550 U.S. at 378–80). However, "[i]n cases where there is a reliable video depicting the events in question, courts must not adopt a version of the facts that is 'blatantly contradicted' by the video footage." *Id.* (citing *Scott*, 550 U.S. at 380).

IV.     **Discussion**

        A.  <u>Summary Judgment Will Be Denied on Younger's Excessive Force Claim</u>

              1.  The Fourteenth Amendment's Objective-Unreasonableness Standard

For an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). The Court previously outlined the applicable framework:

> The Eighth Amendment's prohibition against cruel and unusual punishment is inapplicable to pretrial detainees, who are instead protected by the Due Process Clause of the Fourteenth Amendment, which protects a pretrial detainee against "punishment." *Hubbard v. Taylor*, 399 F.3d 150, 158-67 (3d Cir. 2005) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)); *see, e.g.*, *Bistrian*, 696 F.3d at 372 –75; *Murray v. Keen*, 763 F. App'x 253, 255 (3d Cir. 2019) ("sentenced prisoners are protected from only punishment that is 'cruel and unusual,' while pretrial detainees are protected from any punishment.") (citing *Hubbard*, 399 F.3d at 166–67); *Robinson v. Danbert*, 673 F. App'x 205, 209 (3d Cir. 2016) (the Fourteenth Amendment "'protects a pretrial detainee from the use of excessive force that amounts to punishment.'") (quoting *Kingsley v. Henrickson*, 576 U.S. 389, 397–98 (2015), which quoted *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)).
>
> The following six "*Kingsley* factors" are considered when evaluating a pretrial detainee's excessive force claims: "[1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting." *Robinson*, 673 F. App'x at 209 (quoting *Kingsley*, 135 S. Ct. 2473).

(ECF No. 30 at 9–10).

              2.  Defendants Fail to Apply the Proper Standard

Despite acknowledging that Younger was a pretrial detainee at the time of the alleged excessive force incident (*see* ECF No. 125 at 4–5; ECF No. 124 ¶ 1), Defendants' motion applies

the Eighth Amendment standard,[10] which prohibits cruel and unusual punishment for *convicted* individuals.  (*See* ECF No. 125 at 2–4.)

The objective standard from *Kingsley* cannot be applied mechanically, but instead "requires 'careful attention to the facts and circumstances of each particular case.'" *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 194 (3d Cir. 2021) (citing *Graham v. Connor*, 490 U.S. 386, 396). To determine whether the Defendants used objectively unreasonable force requires the Court to "analyze these circumstances 'from the perspective of a reasonable officer on the scene.'" *Id.* (citing *Kingsley*, 576 U.S. at 397).  In doing so, "'[s]afety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face.'… 'Officers facing disturbances "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."'" *Id.* (citing *Kingsley*, 576 U.S. at 399).

Defendants' motion, although arguing that the Court should defer to their security concerns for inmates and officers within the facility, fails to address any of the *Kingsley* factors regarding the excessive force alleged against each Defendant and boils down to the argument "[t]he actions of each of the [] Defendants was clearly in an effort to maintain or restore discipline in the facility." (ECF No. 125 at 2–5.)  Thus, the Court will not grant summary judgment in favor of Defendants on the issue of excessive force.  Further, as discussed in the context of Defendants' qualified immunity argument, there are genuine issues of material fact with respect to the issue of whether each Defendant used excessive force.

---

[10] For example, while Defendants analogize this case to *Mohamad v. Barone* (ECF No. 125 at 4), the excessive force claim in that case arose under Eighth Amendment.  494 F. App'x 212, 213–215 (3d Cir. 2012).

3.   Defendants' Qualified Immunity Claims

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an objective decision to be decided by the court as a matter of law. *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004). A defendant "bears the burden of establishing his entitlement to qualified immunity." *Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations in original). It is intended to shield officers who make "reasonable but mistaken judgments about open legal questions" and provides protection of "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft*, 563 U.S. at 743. The ultimate question is whether the state of the law when the offense occurred gave Defendants "fair warning" that their acts were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Thus, in "the familiar qualified immunity analysis, the court asks '(1) whether the [defendant] violated a constitutional right, and (2) whether the right was clearly established, such that 'it would [have been] clear to a reasonable [defendant] that his conduct was unlawful.'" *El v. City of Pittsburgh*, 975 F.3d 327, 334 (3d Cir. 2020) (citing *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011). The court may address the steps in either order. *Pearson*, 555 U.S. at 236.

19

4. Because Genuine Issues of Material Fact on the Alleged Force Used by Defendant Gross Prevent a Finding of Qualified Immunity, Summary Judgement Will Be Denied

     i. There Is a Genuine Issue of Material Fact as to whether Defendant Gross Violated Younger's Right to be Free from Excessive Force under the Fourteenth Amendment

There is a genuine issue of material fact whether Defendant Gross violated Younger's right to be free from excessive force under the Fourteenth Amendment.

According to Younger's Second Amended Complaint, Gross entered his cell on June 14, 2019 and punched him in the face five times. (ECF No. 104 ¶ 12.) After that, Younger exited with his belongings because Gross told him "N***** you trying to tell on me" and told him "your (sic) going to the hole." (*Id.* ¶ 13.) Thereafter, Gross then "jumped on [Plaintiff's] back to take [him] down" even though Younger was posing "'no' threat" to the correctional officers at the scene. (*Id.* ¶ 14).

As recounted in the outline of the videos above, there is an instance in which Gross (along with Holt and Vause) enter Younger's cell, but neither video shows exactly what occurred in Cell 123. Although Defendants argue that the video shows that Younger had "already begun his non-compliance to Gross's orders when Gross enters the cell" (ECF No. 125 at 9), the videos (which do not have audio) do not show Younger (because he appears to be *in* his cell—contrary to Defendants' assertions). Further, the initial discussion with Gross did not appear heated given Gross walked around several times leaving the door to Cell 123 open. When Gross finally entered Cell 123, neither video captures the interaction within Cell 123 until Younger is finally extracted by Gross, Holt, and Vause. Although Defendants argue that the video proves that Gross did not punch Younger in the face because Younger was standing and walking, drawing all reasonable

20

inferences in Younger's favor, the fact that he is walking outside (with Gross and Vault or Holt) holding him, is not dispositive on this issue.[11]

Finally, Defendants argue that as Younger is standing up and walking out, he is continuing to be non-compliant when exiting the cell. (ECF No. 125 at 9.) However, drawing all reasonable inferences in Younger's favor, it is difficult from the video (which does not have audio) to determine who is responsible from Younger's moving (Younger himself or Gross, Holt, and/or Vause pulling on him in different directions). Further, the Defendants do not address Younger's claim that Defendant Gross then "jumped on [Plaintiff's] back to take [him] down" even though Younger was posing "'no' threat" to the correctional officers at the scene. (ECF No. 104 ¶ 14.) From the video in the hallway, it is unclear why Younger, Gross, and either Holt or Vause leaned to the left and fell over, though from the video in the common room, drawing all reasonable inference in Younger's favor, it would appear that Gross "bear hugged" and swung Younger down to the floor.

Drawing all reasonable inference in Younger's favor, there is a genuine dispute of material fact whether Gross used an objectively reasonable amount of force when he punched Younger in the face five times and pulled Younger on the floor.

---

[11] Further, the picture of Younger after the entire encounter is so poor that it is impossible to determine the extent of his injuries. (*See* ECF No. 133-1 at 71). This is equally true for the version on ECF and the paper copy submitted to Chambers.

        ii.   Adopting Younger's Version of the Facts, the Right to be Free from Excessive Force in the Form of Five Unprovoked Punches to the Face and Slamming a Non-Resistant Pretrial Detainee to the Ground Was Clearly Established under the Fourteenth Amendment at the Time

As discussed above, there is a genuine dispute of material fact whether Gross used an objectively reasonable amount of force in his interaction with Younger.  Adopting Younger's version of the facts, it was clearly established at the time of the incident that a correctional officer punching a non-resisting pretrial detainee (who was asking to file a grievance and speak to a captain about library time) in the face five times and then jumping on him to get him to ground when escorting him away would be a violation of Younger's Fourteenth Amendment right to be free from excessive force.  *See Jacobs v. Cumberland Cnty*, 8 F.4th 187, 197 (3d Cir. 2021) ("the Supreme Court has made clear that officers may not expose inmates to gratuitous force divorced from any legitimate penological purpose.")

"Although mindful of the United States Supreme Court's admonition that qualified immunity is to be decided 'at the earliest possible stage in litigation,'" *Hayhurst v. Upper Makefield Twp.*, No. 06-3114, 2007 WL 1795682, at *8 (E.D. Pa. June 20, 2007) (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)), given the genuine issues of material fact as to whether (and how) these events occurred—considering Younger's certified Second Amended Complaint, Gross' incident reports, the lack of video evidence of what occurred in Cell 123, and inconclusive videos as to whether Younger was actively resisting during the incident—the Court is unable to resolve the issue of the qualified immunity on summary judgment.  Thus, Defendants' Motion for Summary Judgment in favor of Gross on this claim will be denied.

5.  Because Genuine Issues of Material Fact on the Alleged Use of the Taser by Defendant Tucker Prevent a Finding of Qualified Immunity, Summary Judgement Will Be Denied

i.  There is a Genuine Issue of Material Fact as to whether Defendant Tucker Violated Younger's Right to be Free from Excessive Force under the Fourteenth Amendment

Defendants characterize Younger's claims against Tucker as only "one action": her "use of the taser was in violation of Plaintiff's rights." (ECF No. 125 at 8.) Younger's Second Amended Complaint contends that "Tucker tased Plaintiff in his side, back and shoulder" while he was handcuffed and caused him nerve problems. (ECF No. 104 ¶ 17.) He further contends that Tucker stated "Lets (sic) fuck him up." (*Id.*)

Despite Defendants' attempt to minimize Tucker's involvement as only "one action," the video in the common room appears to show Tucker's taser making contact with Younger's body six separate times for an approximate total of 4 minutes and 41 seconds, much longer than the three, five-second stuns described in Tucker's Use of Force Occurrence Report. (*See* ECF No. 124-2 at 3–4; *see also* ECF No. 104 ¶¶ 17, 31 (Younger stating that "Tucker tazed Plaintiff in his side, back and shoulder," approximately "3 to 6 times in his body and handcuffed"); *see also*, ECF No. 133-1 at 10 (officer report noting that "Tucker drive stunned [Younger] with her [Taser] to get inmate Younger to lean forward to take handcuff off the inmate."); ECF No. 133 at 4 (alleging that "Tucker tased [Younger] while in the restraint chair at 10:49 am").) While it is impossible to tell from watching the videos whether the Taser was actively stunning Younger the entire time Tucker made contact between Younger's body and the Taser, the Court must draw all reasonable inferences in favor of Younger at summary judgment.

Further, even among Defendants' own documents in support of summary judgment, there is a lack of clarity as to whether and to what extent (handcuffs, shackles, restraint chair, and

physical force by various correctional officers) Younger was subdued when Tucker used the Taser. *Compare* ECF No. 124-2 at 2 ("Tucker used her taser to incapacitate the inmate until control was gained or compliance was given.") *with id.* at 4 ("Once they were able to cuff him, he continued to resist… [w]hile we were waiting for the restraint chair, inmate Younger became combative and attempted to kick Officer Panza at which time, I administered a 5 second drive-stun to the back part of his thigh") *and id.* ("I ordered officers to secure the tethers to the cuffs and to apply the shackles to [his] ankles… Once in the chair, I ordered the officers to secure his limbs one by one… he resisted and to gain control, I administered a 5 second drive stun to the upper part of his back.")

Drawing all reasonable inference in Younger's favor, there is a genuine dispute of material fact whether Tucker used an objectively reasonable amount of force when tasing Younger, including the number of times the Taser was used, the length of time it was applied, and whether Younger was resisting or subdued at the time.

ii. Adopting Younger's Version of the Facts, the Right to be Free from Excessive Force in the Form of Electric Shock when a Non-Resisting Pretrial Detainee is Subdued by Officers and/or Other Mechanical Restraints Was Clearly Established under the Fourteenth Amendment at the Time

As discussed above, there is a genuine dispute of material fact whether Tucker used an objectively reasonable amount of force in using her Taser on Younger.  Adopting Younger's version of the facts, it was clearly established that at the time of the incident using a Taser against a non-resisting pretrial detainee who had already been subdued would be a violation of Younger's Fourteenth Amendment right to be free from excessive force. *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 197 (3d Cir. 2021) (noting in the context of a pretrial detainee that the "Supreme Court has made clear that officers may not expose inmates to gratuitous force divorced from any legitimate penological purpose" and collecting cases predating 2015 showing that "striking a physically

24

restrained and nonthreatening inmate—was clearly unlawful under the precedent of this Court and our sister circuits."); *see e.g.*, *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) (finding under the Eighth Amendment[12] that it is "established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued"); *see also*, *Brooks v. Johnson*, 924 F.3d 104, 110, 114 (4th Cir. 2019) (reversing grant of summary judgment under the Eighth Amendment where inmate was subjected to a series taser shocks while "handcuffed and surrounded by up to six officers," first when inmate was standing and refusing to hold still for a picture, then 16 seconds later when he was lying on the ground, and then less than one minute later when the officers pulled the inmate back up.)

Given that there is a genuine issue of material fact as to how Tucker used the Taser, the Court is unable to resolve the issue of the qualified immunity on summary judgment. Thus, Defendants' Motion for Summary Judgment in favor of Tucker on this claim will be denied.

6. Because Genuine Issues of Material Fact on the Alleged Force Used by Defendant Holt Prevent a Finding of Qualified Immunity, Summary Judgement Will Be Denied

i. There Is a Genuine Issue of Material Fact as to whether Defendant Holt Violated Younger's Right to be Free from Excessive Force under the Fourteenth Amendment When Jumping on Younger's Head

From a review of the parties' summary judgment papers and the videos, it appears that Defendant Holt is either Correctional Officer #3 or #4. (*See* ECF No. 124-5 at 2 (Holt's incident reports identifies that he arrived at the scene and "saw Officers Gross and Vause attempting to

---

[12] As noted in the Court's discussion on *Kingsley,* Eighth Amendment "cruel and unusual punishment" is a more difficult standard for a convicted prisoner to meet than the Fourteenth Amendments standards protecting pretrial detainees against being "punished." Thus, cases finding violations of a clearly established Eighth Amendment right against the use of excessive force necessarily would apply to a violation of the Fourteenth Amendment right against the use of excessive force.

handcuff' Younger).)   Defendants argue that Younger "only alleges that Holt 'jumped on Plaintiff's head,'" and, therefore, this was an "objectively reasonable response used in an attempt for an officer to restore discipline of the situation."  (ECF No. 125 at 7.)  In doing so, they cite to a concise statement of material fact that states that "[w]hen Officer Holt and the other officers arrived on the scene, Plaintiff had already left his cell in defiance of Officer Gross' orders and Officers were unable to get handcuffs on the Plaintiff."  (ECF No. 124 ¶ 7 (citing ECF No. 124-5).)  This statement of fact is contradicted by the video evidence (where Younger appears to be *in* his cell based on the angle at which Defendant Gross is talking to him) and by Edwards' report on the videos of the incident (in which he says, "Officer Gross attempts to cuff Inmate Younger and *enters* cell 123…" and [a]t 10:42:26 Inmate Younger is *brought out of cell 123* by Officers Gross, Vause and Holt" (ECF No. 124-2 at 2) (emphasis added)).

Drawing all reasonable inference in Younger's favor, there is a genuine dispute of material fact whether Holt used an objectively reasonable amount of force when jumping on Younger's head.

       ii.    Adopting Younger's Version of the Facts, the Right to be Free from Excessive Force Under the Fourteenth Amendment When Jumping on Younger's Head without Reason Was Clearly Established under the Fourteenth Amendment at the Time

As discussed above in the context of the other Defendants, based upon the genuine issues of material fact that exist as to which individual was Holt, what Younger's behavior was at the time of the incident, and what were the overall circumstances at the time, the Court is unable to resolve the issue of the qualified immunity on summary judgment.  Thus, Defendants' Motion for Summary Judgment in favor of Holt on this claim will be denied.

    7.  Because Genuine Issue of Material Facts on the Use of the Restraint Chair by Defendant Edwards Prevent a Finding of Qualified Immunity, Summary Judgement Will Be Denied

        i.  There Is a Genuine Issue of Material Fact as to whether Defendant Edwards Violated Younger's Right to be Free from Excessive Force under the Fourteenth Amendment by Ordering His Placement in a Restraint Chair for Nine Hours without Food, Bathroom Breaks, Medical Care or Intermittent Relief from the Restraints

In *Hope v. Pelzer*, the Supreme Court identified criteria relevant to the use of excessive force test for mechanical restraints for convicted prisoners under the Eighth Amendment and found that "(1) where the inmate had 'already been subdued, handcuffed, [and] placed in leg irons,' and (2) there was a 'clear lack of an emergency situation' such that '[a]ny safety concerns had long since abated,' then (3) subjecting the inmate to 'substantial risk of physical harm' and 'unnecessary pain' serves no penological justification." *Young v. Martin*, 801 F.3d 172, 180 (3d Cir. 2015) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

The Court of Appeals for the Third Circuit has concluded that the standard enunciated under *Hope* is an excessive force claim, not a conditions of confinement claim. *Young v. Martin*, 801 F.3d 172, 180 (3d Cir. 2015) (applying *Hope* to an Eighth Amendment excessive force claim for use of restraint chair); *but see*, *Thomas v. Tice*, 948 F.3d 133. 142 n.6 (3d Cir. 2020) ("We have not held that mechanical restraints cannot be considered in a conditions-of-confinement case; indeed, the improper use of mechanical restraints may be considered in a conditions-of-confinement case.")

Thus, "[b]y extension of the Supreme Court's holding in *Hope*, that a convicted prisoner's claim involving use of mechanical restraints is governed by the Eighth Amendment excessive [force] analysis, a pretrial detainee's claim of excessive force must be analyzed under the Fourteenth Amendment's Due Process Clause" as set forth in *Kingsley*, which "protects a pretrial

detainee from the use of excessive force that amounts to punishment." *Freeman v. Schaffer*, No. 18-11566, 2019 WL 2367083, at \*5 (D.N.J. June 5, 2019) (citing *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989)); *see also*, *Kingsley*, 576 U.S. at 398 (quoting *Bell v. Wolfish*, 441 U.S. 520, 561 (1979) ("[I]n the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'")); *see also*, *Francis v. Smith*, No. 2:21-cv-948, 2022 WL 3701582, at \*3–4 (W.D. Pa. July 28, 2022), *report and recommendation adopted by*, 2022 WL 3700909 (W.D. Pa. Aug. 26, 2022) (applying the *Kingsley* factors to a pretrial detainees excessive force claims related to a restraint chair).

Neither party addresses *Hope*'s factors nor how they would apply in the case of a pretrial detainee under the Fourteenth Amendment. (ECF Nos. 125 & 133.) Instead, Defendants argue that this case is similar to another case in which summary judgment was granted when a convicted prisoner (who behaved belligerently and refused orders) was placed naked with only a sheet over his lap in a restraint chair for twenty-four hours, but was not deprived of food, shelter, medical care, or safety during that time. (ECF No. 125 at 3–4, 7–8 (citing *Mohamad v. Barone*, 494 F. App'x 212, 213 (3d Cir. 2012).) Defendants argue that, by comparison, Younger does not allege being naked and was kept in the restraint chair for only nine hours, and thus they should be granted summary judgment. (*Id.*)

Defendants' argument ignores not only Younger's status as a pretrial detainee as opposed to convicted prisoner but also his allegations in the certified Second Amended Complaint that he was "without 10 min[utes of] relief every two hours, was not feed (sic), nor given medical

treatment for his injuries" and "was made/forced to urine on his self two times because [he] was not given permission to go to the bathroom." (ECF No. 104 ¶¶ 20–21.)

Of those facts, Defendants only address the medical care and argue that "Younger was seen by the nurse around 3:30 pm on June 14, 2019 who noted that he was stunned on the right arm that there were no further injuries." (ECF No. 124 ¶ 12 (citing ECF No. 124-7).) A closer look at the report calls into question whether that medical note even relates to the June 14, 2019 incident. Tellingly, the note was made on June 16, 2019 at 3:22:53 PM and reports that "at approx[imately] 12:45pm client was dry stunned on right arm by staff, due to refusing to put arms back in cell from door slot. No injuries were noted." (ECF No. 124-7 at 2) These assertions are contradicted by the fact that (1) the video footage shows the incident occurring around 10:40 a.m. (not 12:45 p.m.), (2) no incident report refers to Tucker stunning Younger's *right* arm (and there is no visible indication of that in either video), and (3) the video footage shows that Younger's cell door was wide open (as opposed to Younger refusing to put arms back in the cell from the door *slot*). Further, below that June 16, 2019 note, there is in fact another entry for June 14, 2019 at 1:23 p.m., however that is where the report cuts off.[13] (ECF No. 124-7 at 2.)

Drawing all material inferences in Younger's favor, there is a genuine issue of material fact as to whether Defendant Edwards[14] violated Younger's Fourteenth Amendment rights by

---

[13] Based on Younger's exhibits in opposition to the Defendants' Motion, it appear that Younger did received some medical attention from mental health practitioners on June 14, 2019. However, these notes also contain inconsistencies as to his mental health status. *Compare* ECF No. 133-1 at 45 (noting at 1:35 pm on June 14, 2019 "per officer's (sic) and the nurse in front of intake, inmate has been screaming from restraint chair that he is suicidal") *with id.* at 44 (noting at 8:35 pm on June 14, 2019 "[i]nmate stated he doesn't understand why he is on suicide watch on 5C. [I]nmate claims he was not screaming he was suicidal while in the restraint chair in intake.").

[14] Indeed, there is even a genuine dispute of material fact as to whether Defendant Edwards is the correct defendant here. As mentioned above, Defendants offer no facts related to Defendant Edwards, including any involvement in the incident, his authority with respect to ordering a restraint chair, or his authority with respect to leaving Younger in the restraint chair. Rather, Defendants simply acknowledge that Younger "alleges that at a later time, Defendant Edwards *Footnote continued on new page…*

placing a non-resistant inmate in a restraint chair and leaving him without food, bathroom breaks, medical treatment, and the ability to move his limbs for up to nine hours.

The Court is unaware of Third Circuit precedent adapting the *Hope* test[15] in the context of a pretrial detainee (or whether the *Kingsley*[16] factors would take precedence).[17]  Using either test with Younger's version of the facts, however, there is a genuine dispute of material fact as to whether the use of the restraint chair in the conditions described by Younger in his Second Amended Complaint (and generally unrebutted by Defendants) would be violative of his Fourteenth Amendment rights.

---

orders that Plaintiff be placed in a restraint chair, where he remained for nine hours without bathroom breaks, food, or medical treatment."  (ECF No. 124 ¶ 10 (citing ECF No. 104 ¶¶ 19–20).)  Looking at Tucker's Use of Force Occurrence report, it appears that she ordered the restraint chair and ordered Younger's placement in the chair.  (*See* ECF No. 124-2 at 4 ("I [Tucker] called for a restraint chair from Intake."); *but see id.* at 3 (Defendant Edwards noting that "a restraint chair was ordered" without specifying by whom.).  There is no information whether the person who ordered the restraint chair is also the person who is responsible for keeping an individual in a restraint chair.  Thus, the Court is left with Younger's allegation that Edwards ordered the placement in the restraint chair in which Younger remained for nine hours versus reports that identify Tucker (or no one) as the person ordering the restraint chair.

[15] For example, from Tucker's own report, Younger was already handcuffed and shackled when he was placed into the restraint chair.  (ECF No. 124-2 at 4; *see also* ECF No. 124-5 ("Once inmate Younger was placed in handcuffs and leg irons he was placed into the restraint chair.").)  Further, given the number of correctional officers milling around in the video, there is a question as to whether there was an emergency situation or any safety concerns.  *Young*, 801 F.3d at 180.  Finally, the allegations that Younger was left without food, medical care, bathroom breaks, and regular relief for nine hours may have subjected him to a "'substantial risk of physical harm' and 'unnecessary pain' serv[ing] no penological justification."  *Id.*  Further, the *Hope* test arises out of the Eighth Amendment "cruel and unusual punishment" context, which is a more difficult standard for a convicted prisoner to meet than the Fourteenth Amendments standards protecting pretrial detainees like Younger against being "punished."

[16] Given the number of officers milling about, the fact that Younger was already handcuffed and shackled, the use of the Taser while he was in the restraint chair, and questions as to whether he was, in fact, non-compliant, there exist genuine issues of material fact regarding the six *Kingsley* factors.

[17] Though "courts have recognized that brief periods in restraints of twenty fours or less typically will not give rise to an Eighth Amendment deliberate indifference claim," *Crawford v. White*, No. 1:14-CV-1682, 2015 WL 3753930, at *13–*14 (M.D. Pa. Apr. 15, 2015), those cases are not dispositive to the issue here, where the Fourteenth Amendment protects Younger as "a pretrial detainee from the use of excessive force that amounts to punishment."  *Kingsley v. Henrickson*, 576 U.S. 389, 397–98 (2015).

> ii. Adopting Younger's Version of the Facts, the Right to be Free from Excessive Force through the Use of a Restraint Chair for Nine Hours without Food, Bathroom Breaks, Medical Care or Intermittent Relief from the Restraints Was Clearly Established under the Fourteenth Amendment at the Time

Defendants argue that Defendant Edwards is entitled to qualified immunity based on the fact that no constitutional violation occurred (ECF No. 125 at 8 (citing *Mohamad v. Barone*, 494 F. App'x 212, 213 (3d Cir. 2012).)  They further argue that placing Younger in a "restraint chair was a good faith effort to restore discipline on the pod and in the facility." (*Id.*)  In doing so, they do not address whether it was clearly established as of June 14, 2019 that placing a non-resistant pretrial detainee in a restraint chair and leaving him without food, bathroom breaks, medical treatment, and ability to move limbs for up to nine hours would violate the Fourteenth Amendment.

In *Hope v. Pelzer*, the United States Supreme Court reversed a finding of qualified immunity for correctional officers when they attached a subdued inmate (who was already handcuffed and in leg irons) to a "hitching post" for seven hours in the sun without a shirt on and who was given water only once or twice and no bathroom break.  536 U.S. 730, 734–35 (2002). The Supreme Court found that the "obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated [plaintiff's] constitutional protection against cruel and unusual punishment." *Id.* at 745.

In *Young v. Martin*, the Third Circuit found that the fourteen-hour use of a restraint chair for compliant inmate who was naked with a smock on his lap in an air-conditioned cell with straps that were initially too tight violated his Eighth Amendment rights.  801 F.3d at 175–76.  In that case, the inmate "was already subdued when subjected to mechanical restraint" and "not violent, combative, or self-destructive at any point during the incident leading up to his prolonged confinement in the restraint chair." *Id.* at 181.  Further, there was no "emergency situation" as the

31

incident only lasted seven minutes "during which two [correctional officers] chatted and laughed while they watched the scene unfold" and the inmate voluntarily complied instructions during that time. *Id.* Finally, the Third Circuit found that there was a dispute whether "the prison officials exposed [plaintiff] to a 'substantial risk of physical harm' and 'unnecessary pain' by placing him in the restraint chair" in violation of the limits set forth by the prison's own regulations.[18] *Id.* at 181–82.

However, the Third Circuit left the question of whether the state of the law at the time of the incident in 2009 "gave the [d]efendants 'fair warning that their alleged treatment of [plaintiff] was unconstitutional,'" and whether the "confinement in the restraint chair violated prison regulations of which the [d]efendants were aware" to the district court. *Id*. at 182. This Court turns to that question now.

As articulated by the Third Circuit in *Baloga v. Pittston Area School District*,

> For a right to be clearly established, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *Mammaro v. N.J. Div. of Child Prot. & Permanenc*y, 814 F.3d 164, 169 (3d Cir. 2016) (citation omitted). Although the right at issue may not be defined "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011), the precise action in question "need not have previously been held unlawful" for the right to be clearly established. *Dougherty*, 772 F.3d at 993 (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)); *see also Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). Where there is neither Supreme Court nor circuit

---

[18] As noted above, Younger alleges that Defendants violated their own policy, but neither party provided evidence of such a policy (or the lack thereof).

> precedent on point, "a robust consensus of cases of persuasive authority" may
> establish the federal right at issue. *al-Kidd*, 563 U.S. at 742 (citation omitted).

927 F.3d 742 (3d Cir. 2019); *see also*, *Clark v. Coupe*, 55 F.4th 167, 182 (3d Cir. 2022); *Peroza-Benitez v. Smith*, 994 F.3d 157, 166 (3d Cir. 2021).

As early as 2002, the *Hope* test outlined the factors to determine whether mechanical restraints violate the Eighth Amendment. *Hope*, 536 U.S. at 738, 748 (noting the Court's own decisions "holding that gratuitous infliction of punishment is unconstitutional, even in the prison context.")  Next, both *Young*'s holding—that the Eighth Amendment was violated where a subdued inmate was naked in a restraint chair for fourteen hours with straps that were initially too tight—and *Kingsley*'s holding—that, because a pretrial detainee is protected from excessive force that amounts to punishment (rather than cruel and unusual punishment), the objective reasonableness standard applies—preceded the incident in this case by four years.

Adopting Younger's version of the facts, it was clearly established at the time of the incident that placing a pretrial detainee, who was already subdued (handcuffed and placed in shackles) for nine hours in a restraint chair *without* food, bathroom breaks, medical treatment for his injuries, and his periodic relief from the restraints, was a violation of his Fourteenth Amendment right.

However, given that there is a genuine issue of material fact as to the circumstances that led to Younger being placed into restraint chair and the conditions in which he was kept, the Court is unable to resolve the issue of the qualified immunity on summary judgment.  Thus, Defendants' Motion for Summary Judgment in favor of Edwards on this claim will be denied.

B.  Defendants' Motion to Dismiss Younger's First Amendment Retaliation Claim
Will Be Granted in Part and Denied in Part

1.  First Amendment Retaliation

To assert a claim for First Amendment retaliation, a plaintiff "must show (1) constitutionally protected conduct, (2) an adverse action by prison officials '"sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights,"' and (3) 'a causal link between the exercise of his constitutional rights and the adverse action taken against him.'" *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (citing *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001))

2.  Defendants Take a Narrow View of Younger's Retaliation Claim

Defendants argue that (1) Younger fails to identify a constitutionally protected activity, and (2) to the extent that the Court were to find the use of the law library to be a constitutionally protected activity, only Gross knew of Younger's intention to use the law library at the time the incident occurred.  (ECF No. 125 at 10).  Defendants further argue that there is no causal connection between Younger's use of the law library and any of the Defendants' actions.[19]  (*Id.*) Younger's response does not address his retaliation claim.  (*See* ECF No. 133.)

By arguing that access to the law library is not constitutionally protected conduct and therefore Younger's retaliation claim fails, Defendants take a narrow view of the Second Amended Complaint and the events described therein, despite the well-established obligation to liberally construe a *pro se* litigant's pleadings.  *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011).

---

[19] Based on Younger's Second Amended Complaint, his retaliation claim is only directed against Gross, Tucker, and Edwards, but not Holt.  (*See* ECF No. 104 ¶¶ 30–33.)

34

With respect to Gross, Younger's Second Amended Complaint alleges that "[o]n or about June 14, 2019, Defendant [] Gross entered plaintiff's cell and assault[ed] plaintiff because plaintiff asked for a captain and a grievance because [] Gross would not let Plaintiff go to the library." (ECF No. 104 ¶¶ 11–14 (alleging that Gross told Younger "N***** you trying to tell on me," "your (sic) going to the hole," after which "Gross jumped on Plaintiff's back to take Plaintiff down.").)   Thus, the action that allegedly triggered the use of excessive force was not Younger's request to go to the law library itself, but rather his request to speak to captain and assert a grievance.  *Watson v. Rozum*, 834 F.3d 417, 423 (3d Cir. 2016) (noting that for the purposes of a retaliation claim, there is no "substantive distinction between retaliation for informing prison officials of an intent to file a grievance or requesting the necessary forms to do so on the one hand, and actually filing such a grievance on the other.").

With respect to Edwards and Tucker, there is no indication that either of them knew that Younger sought to speak to a captain and requested a grievance related to his law library time, as it appears from the Second Amended Complaint that they arrived on the scene after the altercation between the Gross and Younger had begun.  (*See* ECF No. 104 ¶¶ 15–19.)

Thus, on Younger's First Amendment retaliation claim, the Court will deny summary judgment with respect to Gross but will grant summary judgment in favor of Edwards and Tucker, because Younger has failed to establish causal link between the exercise of his constitutional rights and the adverse actions.

**V.**      **Conclusion**

Based upon the foregoing, Defendants' Motion for Summary Judgement will be granted with respect to the First Amendment Retaliation against Defendant Edwards and Defendant Tucker.  The remainder of the Motion for Summary Judgment will be denied.

An appropriate Order follows.


                                        BY THE COURT:


Dated: March 9, 2023                    /s/ Patricia L. Dodge
                                        PATRICIA L. DODGE
                                        United States Magistrate Judge

36